In re Christina Louise RICHARDSON, Debtor.

Bankruptcy No. 96–12694.

United States Bankruptcy Court, S.D. Ohio, Western Division.

Sept. 30, 1997.

Eric W. Goering, Goering & Goering, Cincinnati, OH, for Debtor.

William Fecher, Reisenfeld & Statman, Cincinnati, OH, for Cincinnati Central.

## OPINION AND ORDER

JEFFREY P. HOPKINS, Bankruptcy Judge.

This matter comes before the Court on a motion to determine property of the estate. The Debtor, Christina L. Richardson, filed a petition on May 31, 1996, originally seeking to reorganize under Chapter 13. The case converted to Chapter 7 liquidation on May 21, 1997. A Chapter 7 trustee has been appointed in the case and a § 341 meeting of creditors was held on June 24, 1997.

Several months after the Chapter 13 plan was confirmed, the Debtor received a check in the amount of $2,651 from the Internal Revenue Service (IRS) representing a 1995 earned income tax credit. At that time, Cincinnati Central Credit Union ("Central Credit"), a creditor in these proceedings, moved for a determination that the IRS payment was not property of the bankruptcy estate because the Debtor had pledged those assets as security for three separate loans before filing bankruptcy. The Debtor negotiated the IRS check, tendered part of the proceeds to the Chapter 13 trustee and kept approximately $2,000 claiming it as an exemption under Ohio law.

The Chapter 7 trustee has not asserted an interest in the proceeds of the Debtor's 1995 earned income tax credit. However, Richardson and Central Credit have asked the Court to decide the disposition of these funds because the ruling will affect the administration of the Chapter 7.[1]

Central Credit seeks to obtain all the proceeds from the Debtor's 1995 tax credit under alternative theories of prosecution. Under the first the creditor asserts that the funds from the tax credit are covered by a valid security agreement and second it asserts that the assets are encumbered by an assignment in law or equity. Under either of these theories Central Credit contends that it has an enforceable lien against the funds pursuant to Ohio law.

1. The Court notes the deadline for filing a complaint objecting to discharge of the Debtor or to determine dischargeability of certain types of debts is August 25, 1997. An agreed order extending that deadline to October 1, 1997, was submitted by the parties and entered on August 25, 1997.

The Debtor, on the other hand, claims that $2,000 of the 1995 tax credit refund are exempt. She also maintains that the other $651 is estate property which should be divided equitably among creditors according to the bankruptcy laws.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference entered in this district. This is a core proceeding which the Court is empowered to hear and determine in accordance with 28 U.S.C. § 157(b)(2)(A), (K) and (O). An evidentiary hearing was held on October 22, 1996. The parties submitted post hearing briefs which the Court has considered in rendering its opinion and order. This Court's findings of fact and conclusions of law, pursuant to Rule 7052, shall follow:

## FINDINGS OF FACT

This case involves a practice which is becoming all too familiar on the American landscape among consumers. Here, we examine the largely unregulated practice by financial institutions of lending funds to taxpayers based upon their anticipated income tax refund. While not expressly condoned by the federal government, the practice as far as bankruptcy courts are concerned appears to be growing more popular with debtors who find themselves having to seek the protection under the bankruptcy laws. Too often, already strapped debtors view these programs as a quick answer to their immediate cash problems without the benefit of a long term strategy for addressing the problems at their roots. These debtors very often find themselves worse off than when they started. This case is no exception.

Prior to filing her Chapter 13 petition, the Debtor applied for and received three Refund Anticipation Loans [2] ("RAL") from Central Credit, a credit union where she had an account. Teresa O'Farrell, an employee at Central Credit, described the procedure Richardson undertook to obtain the RALs. As part of the application procedure, a tax return preparer hired by Central Credit interviewed the Debtor and completed her 1995 federal income tax returns which were later electronically filed with the IRS.

Richardson was also required to sign a Refund Anticipation Loan Application and Agreement ("RAL Agreement") at the time of her application. The RAL Agreement provides, in material part, as follows:

I authorize the Credit Union to obtain my Internal Revenue Service ("IRS") Form 8453, and any other information concerning my federal and state tax filings for the year 1995 from my tax return preparer and/or electronic filer in connection with this application.... I authorize the IRS to send my 1995 tax refund to the Credit Union Direct Deposit to my account.... Additionally, I hereby grant the Credit Union a security interest in and to my tax refund, my account at the Credit Union into which my tax refund will be deposited, any other accounts at the Credit Union I may have, and any amounts that are deposited into such accounts from time to time.

. . .

I agree that if for any reason, any part of my Federal Tax Refund is disallowed or offset by the IRS, or if I should receive a refund check in the mail from the IRS, I will advise the Credit Union immediately and promptly repay my Refund Anticipation Loan.

. . .

SHOULD ANY OF THE FOLLOWING SITUATIONS OCCUR, IMMEDIATELY CONTACT THE CINCINNATI CENTRAL CREDIT UNION AT (513) 241–2050.

(1.) If you receive a refund check directly from the IRS. This should not happen since you have chosen Direct Deposit of your refund to your Credit Union account. However, if this does happen, you must endorse the check payable [to] the Credit Union and forward

---

**2.** Refund anticipation loans permit taxpayers to obtain the amount of an expected tax refund from the creditor directly rather than waiting for the refund check or deposit to come from the United States Internal Revenue Service. In ex-

change, the creditor charges a fee ($75 in this case) and is generally given a right of setoff and/or a security interest in the anticipated tax refund.

it promptly to: CINCINNATI CENTRAL CREDIT UNION, 1717 WESTERN AVENUE, CINCINNATI, OHIO 45214–2007.

Central Credit also developed a procedure for collecting the anticipated refunds from the IRS for each of its RAL debtors. Central Credit would have the debtors sign and file with the government an IRS Form 8453, also entitled "U.S. Individual Income Tax Declaration for Electronic Filing."

The IRS Form 8453 is the basic means by which taxpayers are able to electronically file a federal income tax return and cause a refund payment to issue immediately from the IRS. The form requires that taxpayers along with the preparer verify the taxpayer's income, tax withheld, and refund amounts shown on the actual return under penalties of perjury. More importantly, the IRS Form 8453, specifically authorizes that tax refund payment be deposited directly into a designated account at a participating financial institution. In effect, Central Credit and the debtors would supply the IRS with a fictitious account number for each debtor at the credit union created for the sole purpose of receiving the deposit. When the transaction was completed, the account would then be closed.

In the routine case, the IRS would deposit the income tax refund directly into the fictitious account and an employee at Central Credit whose task it was to monitor such accounts would be notified by a computer generated error message. That employee would then manually apply the funds to pay off the debtor's RAL. When the system operates properly, the electronic deposit of funds by the IRS is immediately withdrawn by Central Credit upon reaching the designated account.

It is undisputed that the Debtor signed all three RAL Agreements in this case. The first such agreement was executed around February 6, 1996. In conjunction with that contract the Debtor also signed an IRS Form 8453. Subsequently, the Debtor's 1995 federal tax return was electronically filed and pursuant to the RAL Agreement, Central Credit paid the Debtor the anticipated refund amount of $455, less a $75 fee.

Numerous complications developed after Richardson initiated the first RAL, the first of which occurred when the IRS deposited the Debtor's tax refund into her personal account, rather than into the fictitious account, at Central Credit. However, Ms. O'Farrell testified that Central Credit had been aware of a multitude of errors committed by the tax preparer who had worked on the Debtor's 1995 tax return. Thus, when the 1995 tax refund was electronically deposited in Richardson's personal account at the credit union on February 23, 1996, Central Credit immediately set off the $455 refund to pay off the Debtor's first RAL, as the contract authorized.

Subsequently, Richardson determined that the tax preparer had failed to include in her 1995 income tax return the earned income tax credit to which she was entitled for that tax year. Richardson returned to Central Credit to have her 1995 federal tax return amended and to ask the credit union for another loan for the full amount of the anticipated tax credit.

Normally, Central Credit maintained a strict policy prohibiting debtors from entering into RALs related to earned income credit. However, on February 29, 1996, the parties entered a second RAL Agreement for $1,000 based upon Richardson's anticipated receipt of earned income credit calculated at $2,651 by the credit union.

Central Credit did not require the Debtor to execute and file with the government an IRS Form 8453 on the second RAL. There was a concern at the time that the IRS would not accept an application for an electronic transfer of the earned income tax credit. Thus, Central Credit never put in place the offset procedure it had established for securing the loan in relation to the second RAL Agreement. As a precaution, however, Ms. O'Farrell testified that she highlighted and marked as "IMPORTANT" the portion on the second RAL Agreement stating that if Richardson received a check directly from the IRS then she was to immediately endorse the check over to Central Credit.

Central Credit's tax return preparer failed to timely file Debtor's amended 1995 federal

income tax return which resulted in the Debtor again contacting Central Credit in early April 1996, because she had not received the expected funds from the IRS. Based on these and other problems that Central Credit was experiencing with its tax preparer, the parties entered into a third and final RAL Agreement on April 3, 1996. The Debtor executed the third RAL Agreement for the full $2,651 of the estimated earned income credit. However, Central Credit only advanced Debtor additional funds of $1,651 using $1,000 from the third loan to pay off the remaining balance on the second loan from February 29, 1996.

Also, for the third RAL, Debtor completed and signed a RAL Agreement. Once again the Debtor was not required to execute and file an IRS Form 8453 in connection with that RAL. As the result, no deposit procedure was established in order to receive the electronic transfer of the funds from the IRS and for the credit union set off to occur.

Finally, in August 1996, prior to the case converting to Chapter 7, the Debtor received a check from the IRS for $2,651 equaling the total anticipated 1995 earned income credit which she had claimed on her amended tax return. The check was made payable to the Debtor only. Rather than endorsing the check over to Central Credit as called for in the RAL Agreements, the Debtor turned the funds over to her attorney on his instruction. Richardson also testified at the hearing that she paid a portion of the funds, approximately $650, to the Chapter 13 trustee and retained the balance, approximately $2,000, as an earned income credit exemption.

## DISCUSSION

Central Credit first argues that the Debtor's 1995 earned income tax credit is not property of the estate because that property interest had been assigned by the Debtor prepetition. Central Credit contends that property of the estate is determined under state law, that the Debtor's assignment of her right to the tax credit is recognized by federal law and enforceable under Ohio law, and that as the result of the assignment Central Credit alone holds legal and equitable title to the proceeds from Debtor's 1995 earned income credit.

This case appears to be one of first impression in Ohio. We begin our analysis in the same place as did the bankruptcy court in the analogous case *In re Martin*, 167 B.R. 609 (Bankr.D.Or.1994)(applying Oregon law). Thus, the first inquiry is whether on April 3, 1996, the date of the alleged assignment, Richardson held a property interest in the 1995 earned income credit. In general, the existence and scope of the debtor's interest in a given asset is determined by state law. However, a claim to a federal tax refund arises under federal law; its nature and existence is determined by federal law. *See In re Martin*, 167 B.R. at 612. For the reasons that appear in the later portions of this opinion, we believe a similar treatment must also be afforded to an earned income credit.

Thus, only if this Court finds that Richardson held a property interest in the 1995 earned income credit at the time she signed the RAL Agreements, must we then inquire whether that interest may be assigned. This inquiry necessarily involves an analysis of both federal law and state law. Only if the Court decides that the Debtor could assign her 1995 earned income credit to Central Credit will this Court then be required to interpret the RAL Agreements themselves in order to determine whether the assignments were valid under state law. *See In re Martin*, 167 B.R. at 612.

### Property Interest

It is now well settled that an individual's right to a tax refund arises at the end of the tax year to which the refund relates. *In re Martin*, 167 B.R. 609. In the context of a bankruptcy proceeding, it has also been determined that the obligation of the IRS to a debtor for a tax refund arises as of the end of the relevant tax year and the debtor only has to have satisfied the procedural requirements to secure the tax refund. *In re Dominguez*, 67 B.R. 526 (Bankr. N.D.Ohio 1986).

In this instance the relevant tax year ended on December 31, 1995. There is no serious doubt that the Debtor satisfied the procedural requirements to secure the tax

refund having had her 1995 federal tax returns prepared and electronically filed by the Central Credit initially around February 6, 1996. Moreover, the dates Richardson executed each of the three RAL Agreements with Central Credit—February 6, 1996, February 29, 1996 and April 3, 1996—occurred after the 1995 tax year had ended. We find therefore that Richardson had an assignable property interest in the 1995 tax refund at the time she executed the RALs under review.

■ In this case, however, the funds the Debtor anticipated receiving from the IRS consisted of an earned income tax credit. Fortunately, the question whether courts must treat the funds from an earned income tax credit any different from a tax refund has already been put to rest by the Supreme Court. *Sorenson v. Secretary of Treasury*, 475 U.S. 851, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986). In *Sorenson*, the Court rejected a taxpayer's argument that earned income credits are not a refund of federal taxes paid. In reaching this conclusion, the Supreme Court determined that "to the extent an excess earned income credit is 'payable' to an individual, it is payable as if it were a refund of tax paid." *Sorenson*, 475 U.S. at 863, 106 S.Ct. at 1608.[3] Accordingly, we find that Richardson also had a property interest in her anticipated 1995 earned income credit at the moment when she executed each of the RAL Agreements.

■ Since Richardson had a right to both the income tax refund and earned income credit for the 1995 tax year before filing for bankruptcy, those rights were also assignable prepetition. "Even the common law recognized that a debt already earned and presently due is assignable." *In re Duke Roofing Co., Inc.*, 47 B.R. 990, 994 (E.D.Mich.1985) (discussing difference be-

tween a tax refund in which taxpayer has a right as of the end of the tax year as opposed to a refund on unearned insurance premiums in which certain events must occur before a right in the refund arises). *See also In re Martin*, 167 B.R. 609; *In re Kendrick*, 14 B.R. 764 (Bankr.W.D.Okla.1981).

We note, however, that prior case law in Ohio has held that a debtor's earned income tax credit could not be property of the estate, but was exempt under former Ohio Revised Code §§ 2329.66(A)(9)(e) and 5113 providing for an exemption of "poor relief payments." An amendment to the Ohio exemption statute became effective July 17, 1995, and cases subsequent to those modifications have determined that a debtor's earned income tax credit can be property of the estate under the new statutory provisions.[4]

One of the leading cases in this area is *In re Beagle*, 200 B.R. 595 (Bankr.N.D.Ohio 1996). After performing a thorough review of all the policy considerations, Judge Bodoh found that the debtor's earned income credit was property of the estate, did not qualify under Ohio's statutory exemptions and must be paid over to the Chapter 7 trustee for the benefit of the creditors to the bankruptcy estate. In refusing to deem the tax credit exempt from consideration as property of the estate the Court noted:

> Leaving such payments [earned income credit] subject to the satisfaction of general obligations of the recipient appears to be wholly at odds with Congress' intent in enacting the earned income credit program. However, absent a clear expression by Congress of its intent that such credits be exempt from the reach of creditors or the trustee and with no similar provision exempting the payments, when in the hands of the recipient, from the reach of creditors under applicable Ohio law, the court finds no basis upon which to exempt

**3.** In her post hearing brief, the Debtor indicates that courts have previously found that there is a distinction between a tax refund and an earned income credit. *See In re Hurles*, 31 B.R. 179, 180 (Bankr.S.D.Ohio 1983)("[W]hile the earned income tax credit is given effect through the income tax return and contemplates a payment of funds belonging to the United States government, it is not an income tax refund because it does not represent a return of funds withheld

from the debtor's wages.") *In re Hurles* was decided prior to *Sorenson*. It appears that *Sorenson, sub silentio,* overrules the holding of *Hurles* that earned income credit should be treated differently from an income tax refund.

**4.** *See In re Beagle,* 200 B.R. 595 (Bankr.N.D.Ohio 1996); *In re Kurilich,* 199 B.R. 161 (Bankr. N.D.Ohio 1996).

the payments once in the hands of the recipient. If Debtor either had the funds on hand on the petition filing date or was then entitled to and later received the funds, the Court must conclude the payments were property of Debtor's estate. *In re Beagle,* 200 B.R. at 598. *See also In re Kurilich,* 199 B.R. 161 (Bankr.N.D.Ohio 1996)(debtor required to turn over earned income credit to Chapter 7 trustee).

In this case, however, Richardson argues that she is entitled to have the Ohio exemption applied as it existed prior to the 1995 amendments to § 2329.66. Richardson contends that at the time she received the IRS check, nearly the entire amount of the earned income credit was exempt from the reach of creditors under the provisions of the former statute.

■ However, the pleadings all indicate that Richardson received the earned income credit check from the IRS sometime in August 1996. Section 2329.66 was revised effective July 17, 1995, more than a year prior to Debtor's receipt of her earned income credit. As discussed, Debtor's property interest or rights to receive the earned income credit did not arise until the end of the tax year, December 31, 1995. Thus, at the time the amendment to § 2329.66 went into effect, Debtor had no vested rights in her 1995 earned income credit, and therefore is not entitled to have the exemptions applied as they existed prior to the amendment.

■ Moreover, because Richardson *voluntarily* pledged her interest in the 1995 earned income credit as security for the loan from Central Credit, she is estopped from claiming that those funds are exempt under the pre-amended version of § 2329.66. Section 2329.661 of the Ohio Revised Code provides that § 2329.66 "does not affect or invalidate any ..., security interest, or pledge of any personal property, or any lien created thereby." Ohio Rev.Code Ann. § 2329.661 (Anderson 1997). A valid lien obtained prepetition by a creditor under the applicable state law cannot be avoided under the provisions of 11 U.S.C. § 522(f), unless it impairs

an exemption *and* is one of the enumerated liens to which § 522(f) applies. Neither of these requirements have been met in this case.[5]

■ Accordingly, we conclude that the earned income credit was not exempt from execution by a creditor under § 2329.66 exemption. Under the appropriate circumstances in a Chapter 7 case, earned income credit can be considered property of the bankruptcy estate and be distributed to creditors by the trustee.

In this case, however, the credit union claims that the Debtor pledged those assets as security for three RALs and that it has priority over any other creditor. We consider next Central Credit's argument that Debtor's earned income credit was the subject of a valid assignment and security agreement and thus unavailable for distribution to creditors.

### Assignment of the Earned Income Tax Credit

A review of whether Richardson's anticipated 1995 federal earned tax income credit was assigned prior to the Debtor filing bankruptcy requires a discussion of both federal and state law concepts.

*Federal Law Issues.*

As in *In re Martin,* the parties in this case have failed to discuss whether the purported assignment of the Debtor's tax refund to Central Credit under the RAL Agreements complies with the Assignment of Claims Act, 31 U.S.C. § 3727 (the "Act"), and the effect, if any, on the rights of the parties for noncompliance.

■ The Act defines "assignment" as "a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim." *Id.* This extremely broad definition encompasses the assignment of Debtor's claim against the IRS for her 1995 earned income credit. *See In re Martin,* 167 B.R. 609; *In re R & L Refunds, Inc.,* 96 B.R. 105 (Bankr.W.D.Ky.1988). Section 3727(b) of the Act provides:

**5.** In a later section of this opinion, entitled Security Interest, we deal with the attachment of the credit union's lien to the 1995 earned income tax credit payment to the Debtor.

An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged.[6]

■ Here, the three RAL Agreements signed by the Debtor are witnessed by only one person and were not acknowledged before a notary public or other official. Further, "because at the time of the execution of these documents the refund claim was contingent upon a final determination by the IRS of the refund amount, it cannot be said that the amount of the claim had been decided prior to the assignment." *In re Martin,* 167 B.R. at 614. The RAL Agreements, therefore, do not meet the requirements of the Act.

■ Case law has held, however, that the purpose of the Act is to protect the federal government. *In re Martin,* 167 B.R. at 614–15. Consequently, courts have determined that where the refund anticipation loan fails to comply with the Assignment of Claims Act, the creditor's claims against the United States Government are invalid, but "no court has nullified an assignment as between the individual private parties simply because it failed to comply with the statute." *See R & L Refunds, Inc.,* 96 B.R. at 107; *see also In re Danning v. Mintz,* 367 F.2d 304 (9th Cir.1966), *cert. denied,* 386 U.S. 990, 87 S.Ct. 1305, 18 L.Ed.2d 335 (1967)(noncompliance with Assignment of Claims Act does not affect validity of assignment as between individual parties); *In the Matter of Freeman,* 489 F.2d 431 (9th Cir.1973). Thus, noncompliance with the Act does not render the assignment as between the Debtor and Central Credit void on its face or unenforceable. However, a court must examine the instruments themselves to determine, if in fact they have created a valid assignment enforceable between the parties entering the agreement.

Central Credit relies heavily upon an IRS Revenue Procedure issued December 11, 1995, for the proposition that the Debtor's 1995 tax refund and credit had been assigned prior to the bankruptcy case. Apparently, Central Credit believes that because the IRS recognizes the validity of RALs as contracts between taxpayers and financial institutions, this creates an assignment under federal law. We find this argument to be without merit.

In relevant part, the Revenue Procedure provides:

.01 A Refund Anticipation Loan (RAL) is money borrowed by a taxpayer that is based on a taxpayer's anticipated income tax refund. The Service has no involvement in RALs. A RAL is a contract between the taxpayer and the lender.

.02 Any entity that is involved in the Electronic Filing Program, including a financial institution that accepts direct deposits of income tax refunds, has an obligation to every taxpayer who applies for a RAL to clearly explain to the taxpayer that a RAL is in fact a loan, and not a substitute for or a quicker way of receiving an income tax refund. An Electronic Filer must advise the taxpayer that if a Direct Deposit is not timely, the taxpayer may be liable to the lender for additional interest on the RAL.

. . .

.08 [A] bank, as defined in § 581, may accept the full amount of a refund check as a deposit in the taxpayer's account for the benefit of the taxpayer.[7]

---

**6.** Subsection 3727(c) provides an exception to application of the Act to certain financial institutions. However, this exception has been interpreted to be inapplicable to a federal tax refund. *See In re Martin,* 167 B.R. 609. In addition, to be entitled to the exception, notice of the assignment and a copy of the assignment must have been provided to certain officials. That does not

appear to have occurred in this case from the evidence presented.

**7.** 26 U.S.C. § 581 defines a "bank" as "a bank or trust company incorporated and doing business under the laws of the United States ... or of any State, a substantial part of the business of which consists of receiving deposits and making loans

The Revenue Procedure relied upon by Central Credit does not address whether the tax refund is "assigned" but rather describes the RAL as a "loan." Nothing in the Revenue Procedure specifically prohibits the assignment of a tax refund. More importantly, however, contrary to Central Credit's assertion, nothing in the IRS Revenue Procedure clearly ordains this transaction as one meeting a definition of an assignment under federal law.

However, *In re Swartz*, 119 B.R. 219 (Bankr.D.Idaho 1990), presents an interesting analysis of the bankruptcy laws with regard to an assignment on almost the same facts as occur here. Because of the factual similarities we also find the case to be persuasive.

*Swartz* involved a preference action by the chapter 7 trustee seeking to reclaim funds for the bankruptcy estate which had been set off prepetition by a bank. The taxpayer-debtor had been a participant in a similar RAL transaction as appears in this case before filing for bankruptcy which also included the signing of an IRS Form 8453. In that case, the bankruptcy court determined that the transaction did not create a preference in favor of the bank. In so holding, the court accurately defines a valid assignment within the context of one of these tax refund loan transactions:

> By the execution of IRS Form 8453, which authorizes the IRS to deposit the refund check with BNB, which authorization is irrevocable since the IRS will not authorize revocation, and by execution of the H & R Block agreement, the taxpayer effectively assigns the repayment to the Bank. Thus, at the time of the execution of these documents an effective assignment or "transfer" of the debtor-taxpayer occurs under the "transfer" definition of Section 101(50).

*In re Swartz*, 119 B.R. at 221.

Because the Debtor did not execute and file with the government the IRS Form

and discounts, ... and which is subject by law to supervision and examination by State or Federal authority having supervision over banking institutions."

8453, it cannot be said that Central Credit possesses the irrevocable [8] authority to claim the proceeds from Richardson's 1995 earned income tax credit by virtue of an assignment as had been discovered in *Swartz*.

We conclude, therefore, based on this discussion that the RAL Agreement did not create a cognizable assignment under federal law. Unless some paramount federal law controls the validity of the assignment, the validity of the assignment is determined by the law of the state in which the transfer takes place. *See In re Danning v. Mintz*, 367 F.2d 304, 308 (9th Cir.1966)(applying the Bankruptcy Act). We turn now to state law for the answer to this inquiry.

*State Law Issues.*

Since each of the parties reside in Ohio and each of the three transactions took place within this State, the law of Ohio is determinative of the validity of the assignment. In defining an assignment, the Ohio Supreme Court has stated generally that:

> It is necessary ... in order to constitute an assignment either in law or equity, that there should be such an actual or constructive appropriation of the subject matter assigned as to confer a complete and present right on the assignee, even when the circumstances do not admit of its immediate exercise.

*Christmas's Adm'r v. Griswold*, 8 Ohio St. 558, 563–64 (1858).

An equitable assignment, on the other hand, is defined:

> [A]s an executory agreement or declaration of trust not enforceable as an assignment by a court of law, but which a court of equity exercising discretion will execute or not according to the circumstances of the case.

6 Ohio Jur.3d *Assignments* § 1.

For either type of assignment to be valid in Ohio it:

**8.** The IRS Revenue Procedure indicates that once Form 8453 has been accepted, the direct deposit election cannot be rescinded, the routing transit number cannot be changed and the taxpayer's account number cannot be changed. Rev. Proc. 95–49, 1995–50 I.R.B. 5.

[m]ust comply with fundamental requisites for contracts generally, as respects the legality of object, capacity of parties, consideration, and consent, but any language, however informal, which shows the intention of the owner of a chose in action to transfer it is sufficient. While the formal phrase ordinarily used in an assignment is: "For value received, I hereby transfer, set over and assign unto ...," no particular form is necessary, especially in equity.

6 Ohio Jur.3d *Assignments* § 24.

Moreover, as a general rule:

[T]he assignee stands in the shoes of the assignor with respect to the subject of the assignment, having the same rights and remedies, and being subject to the same equities and defenses that may be asserted against the assignor.

6 Ohio Jur.3d *Assignments* § 34.

We have found no bankruptcy cases applying Ohio common law in this area. Thus, we must construe the RAL Agreements in light of the general principles of law on assignment as we have found them to exist under Ohio law.

■ In the case before us, Richardson owes Central Credit for the third RAL only since she had already repaid the first RAL and the second RAL as a pre-condition to receiving the third loan. We conclude after careful analysis that this agreement, at best, gave Central Credit a contract right to set off the amount of the tax credit from Debtor's accounts and a security interest in the accounts and proceeds. While particular words are not required to create an assignment, the instrument must confer rights— upon the assignee stronger than merely a set off or security interest—for the law to deem that contract to be a valid assignment. Nowhere in the RAL Agreement is there a statement that the Debtor made a complete transfer of her right to any portion of the funds from her 1995 tax credit refund to Central Credit. It merely states that "I authorize the Credit Union to establish an account in my name to receive payment of my tax refund and to set off or deduct from the proceeds thereof or from any other account I may hold at the Credit Union, the

amount of my Refund Anticipation Loan or any portion thereof."

■ We believe that the execution and filing of the IRS Form 8453 with the government was of equal importance to the creation of a valid assignment under Ohio law as in the case of federal law. All that Central Credit obtained by having Richardson execute the RAL contracts was a covenant on the part of the Debtor to apply a particular fund in payment of a debt as soon as she received the money from the IRS. Parties may contract in Ohio to pay money from a particular fund and that contract may even constitute a valid assignment in some circumstances. However, "[a] covenant on the part of the debtor, to apply a particular fund in payment of the debt as soon as he receives it, will not operate as an assignment, for it does not give the covenantee a right to the funds, save through the covenantor, and looks to a future act on his part as a means of rendering it effectual." *Christmas's Adm'r v. Griswold*, 8 Ohio St. 558, 563–64 (1858).

With the exception of the first RAL Agreement signed by the parties, none of the RAL contracts operates as an assignment because each looks to some future act by Richardson to perfect the rights of the purported assignee. Central Credit's failure to have the Debtor execute and file with the IRS the Form 8453 for the third RAL contract meant that there was no present, irrevocable commitment by Richardson to emancipate the earned income credit covered by that agreement from her dominion and control. The earned income credit could and did come directly to Richardson requiring her to relinquish it to the credit union to complete the transaction. As such, Richardson's entitlement to the 1995 earned income credit never completely transferred to Central Credit as is required under Ohio law for there to be an assignment.

■ In effect, the third RAL Agreement constitutes a contract to assign a right to Central Credit in the future. "A contract to assign a right in the future is *not* a valid assignment. A valid assignment contemplates no further action on the part of the assignor to complete the right of the assign-

ee. A contract to assign involves a promise to do some future act in order to perfect the right of the assignee." *Morris v. Banning,* 77 N.E.2d 372, 375 (Ohio Ct.App.1947)(Wiseman, J., dissenting) (emphasis added).

Because Richardson did not execute and file with the IRS the Form 8453, we find that the third RAL contract by itself is unenforceable as assignment of the Debtor's 1995 earned income credit to Central Credit either under the bankruptcy laws or common law in Ohio. Central Credit has no recourse to collect the funds from the United States Government either because the transaction was not covered under the provisions of the Assignment of Claims Act.

*Equitable Assignment.*

We next consider whether it would be appropriate, under the circumstances in this case, for this Court to erect a remedy effectuating an equitable assignment or constructive trust in favor of Central Credit. Under either of these equitable grounds, Central Credit urges this Court to find that the Debtor holds the proceeds from the 1995 earned income credit in trust for its benefit alone.

 In two cases cited by Central Credit which discuss equitable assignments, Ohio courts have found that "any words or transactions which show an intention on one side to assign and an intention on the other to receive, if there is a valuable consideration, will operate as an effective equitable assignment." *Langhals v. Holt Roofing Co.,* 47 Ohio App.3d 114, 547 N.E.2d 401, 403 (1988)(citing *Morris v. George Banning, Inc.,* 77 N.E.2d 372, 374 (Ohio Ct.App.1947)). "It is a well-recognized principle of law that no particular form is required in order to constitute an assignment." *Morris v. Banning,* 77 N.E.2d at 373. It has been further stated that:

If, however, the assignor does collect the claim, he or she is trustee of the proceeds for the assignee, because of a constructive trust which then arose to prevent unjust enrichment rather than because of any trust relationship created by the assignment itself.

6 Ohio Jur.3d *Assignments* § 41. In addition to this authority, two Sixth Circuit cases, seemingly at odds with one another, are also relevant to the discussion of whether we should find an equitable assignment or constructive trust in this case.

The older case decided under the former Bankruptcy Act, *In re Cincinnati Iron Store Co.,* 167 F. 486 (6th Cir.1909), involved an equitable assignment. There, the debtor who operated a construction business assigned payments to the bank that the business was to receive on work it was performing for certain clients. Based on that assignment, the bank advanced funds to the debtor to run its business. According to their agreement, the debtor was to collect the payments from the clients who had been designated in the contract and immediately turn those funds over to the bank.

When the business went bankrupt, the trustee argued that the assignment was not valid because the assignor retained full dominion and control over the assigned claims. Further, the trustee asserted that the alleged assignments were mere promises to pay out the designated funds when they were obtained under the construction contracts and no notice had been given of the assignment to the debtor's customers.

On appeal, the Sixth Circuit Court found that the assignments were valid noting that the bank had the power to collect the amounts due directly from debtor's customers. In so holding the Court stated:

It is not open to question that under the general law assignments such as those in question, made in good faith, to enable the debtor to raise money for carrying on its business, are valid as against the debtor, notwithstanding no notice was given creditors, and in spite of the fact that the claims assigned remain in the debtor's possession.

. . .

It is not necessary to the validity of the assignments as against the assignor that those liable to pay the claims assigned be notified of the assignment. . . . The contest is entirely between the assignee and the one standing in the shoes of the assignor.

*In re Cincinnati Iron Store Co.,* 167 F. at 490.

Unlike the present case, however, the equitable assignments in *In re Cincinnati Iron Store Co.* contained language actually transferring the accounts to the bank. That case can also be distinguished on the basis that the bank had the ability to collect funds directly from debtor's customers if it wished. By contrast, Central Credit has no recourse to collect from the IRS having had that option foreclosed because of its failure to comply with the Assignment of Claims Act.

■■■ Even though it appears from the RAL Agreements and the Debtor's own testimony that there was clearly an intention on Debtor's part to assign, an intention on the part of Central Credit to receive, and valuable consideration was given, we believe that the Sixth Circuit decision *In re Omegas Group, Inc.,* 16 F.3d 1443 (6th Cir.1994) prohibits this Court from fashioning a postpetition equitable remedy such as a constructive trust or equitable assignment to accommodate the creditor's claim in this case.

In *In re Omegas Group,* a case decided under the Bankruptcy Code, the Court held that a bankruptcy court cannot impose a constructive trust upon the debtor's assets unless a state court has determined, after the issue has been litigated in that forum, that one exists prior to the filing of the bankruptcy case. The Sixth Circuit explained that:

> Because a constructive trust, unlike an express trust, is a remedy, it does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment "impressing" defendant's property or assets with a constructive trust. Therefore, a creditor's claim of entitlement to a constructive trust is not an "equitable interest" in the debtor's estate existing prepetition, excluded from the estate under § 541(d).
>
> . . .
>
> The equities of bankruptcy are not the equities of the common law. Constructive

trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor.

. . .

> To permit a creditor, no matter how badly he was "had" by the debtor, to lop off a piece of the estate under a constructive trust theory is to permit that creditor to circumvent completely the Code's equitable system of distribution.

*In re Omegas Group, Inc.* 16 F.3d at 1451–53.

Since there was no proceeding prepetition in which an Ohio court had impressed the Debtor's 1995 earned income credit and we are bound by the decision in *In re Omegas Group, Inc.,* this Court is without authority to now impose a constructive trust. To hold otherwise, would allow the claims of Central Credit to jump ahead of other creditors of this estate in derogation of the distribution scheme established by the bankruptcy laws. *In re Omegas Group, Inc.,* 16 F.3d at 1451–53 (6th Cir.1994).

Central Credit argues, however, that Richardson will be unjustly enriched because she will, in effect, have received her tax refund twice, once from the IRS and once from Central Credit. However, this Court cannot use its equitable powers to rewrite the RAL Agreements to include the requisite language needed to complete an assignment under either the bankruptcy laws or Ohio law. Nor will this Court exercise its equitable authority under § 105 to correct the errors committed by Central Credit's tax preparer.

■■■ Similar to a constructive trust, an "equitable" action or "equitable assignment" is imposed only through court action. *See* 6 Ohio Jur.3d *Assignments* § 1; *Black's Law Dictionary* 537, 538 (6th ed.1990). Therefore, under the principles espoused in *In re Omegas Group, Inc.,* this Court is also without authority to fashion a remedy such as a constructive trust or equitable assignment which favors one creditor over all the rest.[9]

9. Because of the Debtor's conversion of her case from Chapter 13 to Chapter 7, the rationale expressed by the Sixth Circuit in *In re Omegas Group, Inc.,* applies with equal force: "[i]nas-

much as the constructive trust would now be asserted against assets to be finally liquidated, we believe our arguments against the propriety

## Security Interest

The final argument raised by Central Credit is that it has a valid security interest in the Debtor's 1995 federal income tax credit funds. The Debtor, on the other hand, argues that Central Credit needed to have actual possession of the tax proceeds in order to claim a perfected security interest under Ohio law. The credit union maintains that regardless of whether its security interest was perfected, its interest is still enforceable between the relevant parties, namely Richardson and Central Credit.

State law governs the effectiveness of Central Credit's security interest in the Debtor's 1995 earned income tax credit. The version of the Uniform Commercial Code adopted by the State of Ohio, in relevant portion, provides:

> [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
>
> (1) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral . . . and
>
> (2) Value has been given; and
>
> (3) The debtor has rights in the collateral.

Ohio Revised Code Annotated § 1309.14(A).

The property at issue here is the right to receive the proceeds from a check the Debtor received from the IRS representing an earned income tax credit. In an analogous situation, this Court has previously held that a right to receive a check representing a refund of excess state unemployment taxes represents "a kind of property known in the law as a chose in action or a thing in action." *In the Matter of Gross–Feibel Co., Inc.,* 21 B.R. 648, 649 (Bankr.S.D.Ohio 1982)(Perlman, J.)(discussing definition of "general intangible" under New York Statute which is the same as the Ohio Revised Code).

■ Furthermore, a property right known in the law as a "chose in action" or "thing in action" falls under the definition of "general intangible". *See In re Foreman,*

1990 WL 250987 (N.D.Ohio 1990), *citing In the Matter of Gross–Feibel Co., Inc. 21 B.R. 648.* In Ohio, a secured party may accept a security interest in a general intangible which is defined as "any personal property, including things in action, other than goods, accounts, chattel paper, documents, instruments and money." Ohio Rev.Code Ann. § 1309.01(A)(16) (Anderson 1997).

Having found a property right to which a security interest could attach, we must next consider whether the security interest Central Credit claims to possesses is valid as to the Debtor's 1995 earned income credit from the IRS, under the factors articulated in § 1309.14(A) of the Ohio Revised Code.

■ The focus here is on the third and final RAL Agreement executed by the parties since, as noted above, the debt on the other two loans had already been retired. By signing that agreement Richardson gave Central Credit a security interest *"in and to my tax refund,* my account at the Credit Union into which my tax refund will be deposited, any other accounts at the Credit Union I may have, and any amounts that are deposited into such accounts from time to time," thus providing an adequate description of the collateral being pledged by the Debtor. Further, the Debtor received value in the form of a loan from Central Credit in the amount of $2,651. And, as earlier determined, Richardson had a transferable property interest in the 1995 earned income credit at the moment when the parties executed the third RAL contract. *See In re Martin,* 167 B.R. 609.

We conclude based on these findings that Central Credit held a valid security interest in the form of a chose in action or thing in action. Moreover, that security interest attached to the proceeds from Richardson's 1995 earned income tax credit as a general intangible by definition under Ohio law.

■ We note, however, that Central Credit failed to produce any evidence at the hearing that it perfected its security interest in the Debtor's 1995 earned income credit prior to the bankruptcy petition. "In order

of its application to be even stronger." *In re*

*Omegas Group, Inc.,* 16 F.3d at 1452 n. 8.

to perfect a security interest in a general intangible, R.C. § 1309.21 requires the filing of a financing statement." *Liqui*Lawn Corp. v. Andersons*, 31 Ohio St.3d 145, 509 N.E.2d 1236, 1239 (1987). The effect of such failure to perfect an interest was addressed by the Ohio Supreme Court in *Lojek v. Pedler*, 22 Ohio St.3d 71, 488 N.E.2d 864, 865 (1986).

> Under [ § 1309.14], so long as the debtor had granted a valid security interest in [the chose in action] to the creditor as collateral for a debt and that security interest had attached, the creditor's failure to perfect that security interest was irrelevant to the validity of the security interest as between the parties to the security agreement; perfection was relevant only to disputes among secured creditors as to the relative priorities of their security interests in the securities as collateral.

(Emphasis added.)

Applying these principles, we conclude that although Central Credit's security interest was unperfected, it was nevertheless effective against Richardson when this bankruptcy case was filed. No other creditor in this case has come forward to assert a superior claim to the assets being contested by the Debtor and Central Credit. Nor has the Chapter 7 trustee in this case brought an action for avoidance of Central Credit's unperfected security interest in the 1995 earned income credit. *See* 11 U.S.C. § 545(2); Rule 7001, Federal Rule Bankruptcy Procedure.

Because Central Credit holds a valid security interest in the proceeds from the Debtor's 1995 earned income tax credit, and it has sought distribution of those funds by motion without opposition from any party having a superior claim, the Court finds that motion to be well taken.

## CONCLUSION

Central Credit's motion requesting that the Court find that the tax refund is not property of the estate or that the estate holds only an equitable interest in the tax refund is hereby **DENIED**. The Court finds, however, that Central Credit holds a valid security interest in Debtor's 1995 earned income tax credit which is enforceable against the Debtor. Accordingly, Central Credit's motion so far as it seeks possession of the proceeds from the Debtor's 1995 earned income tax credit is well taken and hereby is **GRANTED**.

**IT IS SO ORDERED.**