STATE of Colorado, ex rel. Ken SALA- ZAR, Attorney General for the State of Colorado; and Laura E. Udis, Adminis- trator, Uniform Consumer Credit Code, Plaintiffs–Appellants,

v.

The CASH NOW STORE, INC., Defendant–Appellee.

The Cash Now Store, Inc. Plaintiff–Appellee,

v.

The State of Colorado, acting by and through the Administrator of the Uni- form Consumer Credit Code, Defendant– Appellant.

No. 98CA2380.

Colorado Court of Appeals, Div. III.

March 16, 2000.

Rehearing Denied May 11, 2000.

Certiorari Granted Oct. 23, 2000.

Ken Salazar, Attorney General, Paul Chessin, Assistant Attorney General, Denver, Colorado, for Plaintiffs–Appellants and Defendant–Appellant State of Colorado and Laura E. Udis, Administrator, Uniform Consumer Credit Code.

Krendl Horowitz & Krendl, Jay S. Horowitz, Philip L. Gordon, Denver, Colorado, for Defendant–Appellee and Plaintiff–Appellee The Cash Now Store, Inc.

Legal Aid Society of Metropolitan Denver, Manual A. Ramos, Denver, Colorado; Florida Legal Serv., Inc., Lynn Drysdale, Jacksonville, Florida; Kathleen Keest, Assistant Attorney General, Des Moines, Iowa, for Amicus Curiae National Association of Consumer Advocates.

Opinion by Chief Judge HUME.

Plaintiffs, the State of Colorado, ex rel. Ken Salazar, Attorney General; and Laura E. Udis, Administrator, Uniform Consumer Credit Code (collectively "the State"), appeal the trial court's denial of its motion for a preliminary injunction against defendant, The Cash Now Store, Inc. (Cash Now). We affirm.

Cash Now engages in the business of purchasing anticipated income tax refunds from taxpayers at a discount. The form agreement entered into between Cash Now and its taxpayer customers reads, in pertinent part:

2. <u>Payment.</u> In consideration of the terms and provisions hereof, Cash Now agrees to pay to [taxpayer] the sum of $____ (the "Total Payment"). [Taxpayer] acknowledges that $____ of the Total Payment shall be paid to [taxpayer] by Cash Now upon [taxpayer's] execution of this Agreement

. . . .

3. <u>Assignment.</u> In consideration of the terms and provisions hereof, [taxpayer] hereby transfers, conveys and assigns all of the [taxpayer's] right, title and interest in and to the Tax Refunds to Cash Now. In accordance with such assignment, [taxpayer]

(a) acknowledges that Cash Now shall have the right to take possession of [taxpayer's] completed tax forms and mail such to the proper Tax agency;

(b) acknowledges that Cash Now shall have the right to receive, open and review all correspondence received by Cash Now related to the Tax Refunds subsequent to the date hereof . . . ;

(c) agrees that in no event shall Cash Now be obligated to refund to [taxpayer] any amounts received by Cash Now hereunder in the event that [taxpayer's] Tax Refunds are audited at a later time;

(d) represents and warrants to Cash Now that [taxpayer] has not assigned its interest in the Tax Refunds to any other party and that such Tax Refunds are not subject to any lien or encumbrance.

. . . .

5. <u>Indemnification.</u> [Taxpayer] agrees to indemnify, hold harmless and defend Cash Now from and against any claim, liability, loss, damage, cost or expense which may be imposed upon or incurred by Cash Now as a result of the breach of any representation or warranty made by [taxpayer] hereunder or as a result of Cash Now not receiving the full amount of the Tax Refunds set forth above. [Taxpayer] acknowledges that [taxpayer's] indemnification obligation shall include, without limitation, indemnifying Cash Now for any portion of the Tax Refund not received by Cash Now in connection with enforcement of this Agreement.

In an additional provision, by way of a power of attorney, the taxpayer grants to Cash Now the power to receive and sign the income tax refund check and to dispose of the proceeds.

The State filed a complaint seeking to enjoin Cash Now's business, contending that it was engaged in making supervised loans without a supervised lender's license in violation of the Uniform Consumer Credit Code, § 5–1–101, et seq., C.R.S.1999 (the UCCC). The State also filed a motion for preliminary injunction in that action. Cash Now initiated a separate declaratory judgment action, seeking a determination of whether the UCCC applied to its business transactions. The State later filed a motion for summary judgment in the declaratory judgment action.

The injunction and declaratory actions were consolidated, and the trial court determined that Cash Now was not engaged in the business of making loans, but rather that of

making purchases of choses in action. The court found that the challenged transactions were not "consumer loans" and that, therefore, the UCCC did not apply to Cash Now's business. Thus, the court denied the State's motion for preliminary injunction and its motion for summary judgment.

## I.

 The State first contends that the trial court applied the wrong standard in reviewing its motion for preliminary injunction. We determine that the error was harmless.

 Initially, we note that if an issue concerns only legal questions, a preliminary injunction ruling is subject to *de novo* appellate review. *Evans v. Romer*, 854 P.2d 1270 (Colo.1993).

 Preliminary injunctive relief is an extraordinary remedy. In order to obtain a preliminary injunction, the moving party must satisfy six criteria as set forth in C.R.C.P. 65 and *Rathke v. MacFarlane*, 648 P.2d 648 (Colo.1982).

 However, where injunctive relief is sought pursuant to a specific statutory procedure in a comprehensive licensing statute, that procedure controls over the more general application of C.R.C.P. 65. *Kourlis v. District Court*, 930 P.2d 1329 (Colo.1997); *see Lloyd A. Fry Roofing Co. v. State Department of Health Air Pollution Variance Board*, 191 Colo. 463, 553 P.2d 800 (1976)(because suit to enjoin statute is in public interest, state agency need not show irreparable injury).

As pertinent here, the UCCC provides that:

> With respect to an action brought to enjoin violations of this code ... the administrator may apply to the court for a ... preliminary injunction against a respondent.... *If the court finds* after a hearing held upon notice to the respondent *that there is reasonable cause to believe that the respondent is engaging in or is likely to engage in conduct sought to be restrained*, it may grant any such tempo-

rary restraining order or preliminary injunction it deems appropriate.

Section 5–6–112, C.R.S.1999 (emphasis added).

Thus, in the context of the State's request for a preliminary injunction here, it was required to demonstrate "reasonable cause to believe" that Cash Now was engaging in conduct prohibited by the UCCC.

We agree with the State's contention that the court should have made its determination of whether to grant the preliminary injunction under the UCCC's standard, rather than C.R.C.P. 65 and *Rathke v. MacFarlane, supra*. However, for reasons more fully described later in this opinion, we conclude that the nature of defendant's business is such that it does not fall under the purview of the UCCC.

Accordingly, as we agree with the trial court's ultimate legal conclusion, we find no reversible error here.

## II.

The State contends that Cash Now's transactions are loans or disguised loans under the UCCC and that, therefore, the trial court erred in denying its motion for a preliminary injunction. We disagree.

This contention requires us to determine whether the challenged transactions constitute "consumer loans" as that term is defined at § 5–3–104, C.R.S.1999, or "loans," under the definition set out in § 5–3–106, C.R.S. 1999.

 Our task in interpreting a statute is to give effect to the intent of the General Assembly. To determine legislative intent, we look first to the plain language employed, giving words and phrases effect in accordance with their plain and ordinary meaning. *City of Westminster v. Dogan Construction Co., Inc.*, 930 P.2d 585 (Colo.1997). The construction of statutory language should comport with the purpose of the legislative scheme, and the language used should be given its plain meaning, unless the result of that application is absurd. *Farmers Group, Inc. v. Williams*, 805 P.2d 419 (Colo.1991).

■ If a statute is unambiguous, there is no need to resort to interpretive rules of statutory construction. However, if a statute is ambiguous, we may consider indicia of legislative intent. *See, e.g., Aetna Casualty & Surety Co. v. McMichael*, 906 P.2d 92 (Colo.1995)(legislative history and underlying purpose may be taken into account in construing ambiguous statute).

The UCCC is to be "liberally construed and applied to promote its underlying purposes and policies." Section 5–1–102(1), C.R.S.1999. These purposes and policies include simplification and clarification of the law governing consumer credit, small loans, and usury, as well as protection of consumers from unfair practices by suppliers of consumer credit. Sections 5–1–102(1), (2)(a) & (d), C.R.S.1999.

## A.

■ Initially, we note that the State correctly asserts that, in construing the pertinent statutory provisions, deference should be given to the interpretation given the statute by the officer or agency charged with its administration. *See Weld County School District RE–12 v. Bymer*, 955 P.2d 550 (Colo. 1998).

■ Administrative interpretations are most useful when the subject involved calls for the exercise of the agency's technical expertise, and when the statutory language is susceptible of more than one reasonable interpretation. *See Manor Vail Condominium Ass'n v. Board of Equalization*, 956 P.2d 654 (Colo.App.1998).

■ However, the court will not be bound by an agency's decision that misconstrues or misapplies the law. Rather, the court must determine all questions of law, interpret the applicable statutes and state regulations, and apply such interpretation to the facts as duly found or established. *Bostron v. Colorado Department of Personnel*, 860 P.2d 595 (Colo.App.1993).

Thus, in the absence of a specific statutory directive, the ultimate legal conclusion in this case—whether Cash Now's transactions constitute "loans" under the UCCC—is for the court to determine.

## B.

■ The State asserts that Cash Now's transactions consist of an advance of money to a customer with the expectation of repayment of a larger sum at a later date, thus compelling the conclusion that they are loans that may be regulated under the UCCC. We are not persuaded.

A "consumer loan" is defined in the UCCC as a loan made or arranged by a person regularly engaged in the business of making loans in which: (a) the debtor is a person other than an organization; (b) the debt is incurred primarily for a personal, family, or household purpose; (c) the debt is payable in installments or a loan finance charge is made; and (d) the principal does not exceed $25,000. Section 5–3–104, C.R.S.1999.

The UCCC defines a "loan" as including, as pertinent here, "[t]he creation of debt by the lender's payment of or agreement to pay money to the debtor or to a third party for the account of the debtor. . . ." Section 5–3–106, C.R.S.1999. A loan is made when a creditor creates debt by advancing money to the debtor. Section 5–3–106, C.R.S.1999, Official Comment.

■ Thus, the essential feature of a loan under the UCCC is that a debt must be created. However, the State has not demonstrated how Cash Now's transactions create debt which a taxpayer-customer is unconditionally obligated to repay.

Rather, Cash Now's transactions involve a sale and assignment of a taxpayer-customer's right to receive an income tax refund from the Internal Revenue Service. A taxpayer anticipating a refund of overpaid taxes has a claim against the government for the same. *See Cullen v. Bragg*, 180 Ga.App. 866, 350 S.E.2d 798 (1986)(taxpayer's right to funds in possession of government is property right which may be sold).

In *Cullen v. Bragg, supra*, a tax preparer paid a taxpayer-client a reduced sum for the taxpayer's right to receive an income tax refund. Relying on Georgia's Industrial Loan Act (GILA) and the federal Truth in Lending Act to contend that the transaction

was a loan, rather than a sale, the taxpayer sought to avoid paying the tax preparer the amount of the refund.

The *Cullen* court held that the transaction constituted a sale of a chose in action (the taxpayer's right to receive an income tax refund), rather than an advance of funds in exchange for the taxpayer's promise to repay it. The court further noted that "[i]f the discounted sale of a tax refund is to be deemed a transaction within the ambit of the [GILA], it can only be accomplished by a specific legislative enactment, not by a broad judicial construction of that statute's definition of the term 'loan.'" *Cullen v. Bragg, supra,* 180 Ga.App. at 867, 350 S.E.2d at 800.

The trial court here relied also on *Berger v. State,* 910 P.2d 581 (Alaska 1996). In that case, an entity purchased at a discount sellers' rights to permanent fund dividends (PFDs) payable by the state government. The sellers assigned their rights under the PFDs and made promises to repay the face value of the PFDs if the state did not pay the proceeds to the purchaser. The state raised the Alaska Small Loans Act as a defense to the purchaser's attempt to enforce payment.

In determining that the transactions were not "loans" or "disguised loans," the Alaska Supreme Court analyzed case law holding that a sale is not necessarily rendered a loan because of the presence of a repayment guarantee. The court then determined that "one constant element of a loan is that the borrower has *an expectation to repay the money advanced unconditionally,* and not merely in default of some other occurrence." *Berger v. State, supra,* 910 P.2d at 588 (emphasis added).

Here, the State has not convincingly demonstrated that any language in the UCCC requires a result contrary to the principles enunciated in these cases. Rather, the distinction drawn in these cases between a "sale" and a "loan" comports with the commonly understood meaning of those terms.

Cash Now's taxpayer-customers sell their rights to receive a tax refund from the federal government; they do not incur an unconditional obligation to repay the money advanced to them by Cash Now. Rather, the taxpayer-customer agrees to indemnify Cash Now for any difference between the amount of the anticipated refund as warranted by the taxpayer and the amount actually paid by the IRS. Thus, the repayment obligation of Cash Now's customers is contingent upon non-payment by the IRS of the represented refund amount. *Cf. Berger v. State, supra.*

Thus, as the State has failed to demonstrate that Cash Now's transactions involve the extension of credit or the creation of debt, those transactions do not constitute "loans" and do not fall under the purview of the UCCC.

The State relied upon *Income Tax Buyers, Inc. v. Hamm,* C/A No. 91–CP–40–3193 (S.C. Ct. Common Pleas, Jan. 14, 1992), an unreported decision from the South Carolina Court of Common Pleas. However, that case does not support a different result here. There, the taxpayer-seller was required under the contract to pay the buyer the full amount of the refund due within six weeks of submission of the tax return, regardless of whether the refunds had issued. That is a clear obligation to repay, one of the essential elements of a loan, which is not present in this case.

■ Further, we note that the determination of whether certain types of transactions like Cash Now's should be regulated, governed, or outlawed as a matter of public policy is best left to the General Assembly. *See Cullen v. Bragg, supra* (applicability of lending statute to a specific transaction should be subject of legislative, not judicial, enactment).

### C.

■ The State also contends that Cash Now's purchases of tax refunds violates the Federal Assignment of Claims Act, 31 U.S.C. § 3727 (1994)(the Act). Therefore, the State argues that, because any "assignment" of taxpayers' refunds would be invalid under the Act, the transactions are actually loans. We disagree with this contention.

■ The Act has as its purposes: the prevention of possible multiple payment of claims by the federal government; making unnecessary the investigation of alleged as-

signments; and enabling the government to deal only with the original claimant. *United States v. Aetna Casualty & Surety Co.,* 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949).

Cases interpreting the Act have emphasized that it was designed to protect the federal government. *See, e.g., In re Richardson,* 216 B.R. 206 (Bankr.S.D.Ohio 1997). However, an assignment of a claim against the federal government is enforceable as between the parties to the assignment, after the government has paid the claim. *See Danning v. Mintz,* 367 F.2d 304 (9th Cir. 1966) (citing *In re Ideal Mercantile Corp.,* 244 F.2d 828 (2d Cir.1957)).

Thus, an assignment that does not comply with the Act is voidable at the federal government's discretion. *See United States v. Sinton Dairy Foods Co., Inc.,* 775 F.Supp. 1417 (D.Colo.1991); *In re R & L Refunds, Inc.,* 96 B.R. 105 (Bankr.W.D.Ky.1988) (assignment of potential tax refunds invalid as against the United States).

However, failure to comply with the Act is not grounds for setting aside an assignment as between its principal parties. *See In re Richardson, supra* (collecting cases); *In re Metric Metals International, Inc.,* 20 B.R. 633 (S.D.N.Y.1981).

Here, Cash Now would be unable to enforce the assignment of the tax refunds before such refunds were issued by the Internal Revenue Service. However, the Act does not require that such assignments be rendered void *ab initio.*

We thus conclude that the Act does not provide support for the State's contention that these transactions are disguised loans.

### D.

The State further argues that the lines of authority regarding sale/leaseback and "sham intermediary" transactions support its contention that Cash Now's transactions are disguised loans. The State also cites cases involving usurious loan transactions, as well as federal statutes regulating purported "refund anticipation loans."

However, as set forth above, we determine that the transactions at issue here are not

"loans" for purposes of the UCCC. Thus, extended analysis of the "disguised loan" issue is not necessary to our construction of the statute.

Finally, we reject the State's argument that Cash Now's transactions can be considered "salary buying," based on the contention that income tax refunds constitute "earnings" under the UCCC. The exclusion of withheld income taxes from the definition of "disposable earnings," *see* § 5–5–105(1)(a), C.R.S.1999, does not compel the conclusion that overpaid taxes subject to refund constitute "earnings" under the statute.

The judgment of the trial court denying the State's request for a preliminary injunction is affirmed.

Judge PLANK and Judge DAVIDSON concur.